[Cite as *State ex rel. Dewine v. Washington C.H.*, 2014-Ohio-3557.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO EX REL. MICHAEL DEWINE, ATTORNEY GENERAL OF OHIO, | : | |
| | : | CASE NO. CA2013-12-030 |
| Plaintiff-Appellant, | : | O P I N I O N<br>8/18/2014 |
| - vs - | : | |
| CITY OF WASHINGTON COURT HOUSE, OHIO, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

CIVIL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. 06 CVH 00352

Michael DeWine, Ohio Attorney General, L. Scott Helkowski, Summer J. Koladin Plantz, Environment Enforcement Section, 30 East Broad Street, 25th Floor, Columbus, Ohio 43215, for plaintiff-appellant

Mark J. Pitstick, City Attorney, City of Washington Court House, 105 North Main Street, Washington Court House, Ohio 43160; Frost Brown Todd LLC, Stephen N. Haughey, 3300 Great American Tower, 301 East Fourth Street, Cincinnati, Ohio 45202; and Frost Brown Todd LLC, Frank J. Reed, Jr., 10 West Broad Street, Suite 2300, Columbus, Ohio 43215, for defendant-appellee

**PIPER, J.**

{¶ 1}  Plaintiff-appellant, the state of Ohio, appeals a decision of the Fayette County Court of Common Pleas denying its motion to find defendant-appellee, City of Washington Court House (the City), in contempt for failing to abide by the terms of a consent agreement

entered between the two parties.

{¶ 2} Washington Court House has a population of approximately 14,000. The percentage of the City's citizens at or below the poverty level is higher than the state average, and many of the jobs in the City are based on manufacturing that is becoming obsolete and in industries that are moving out of the country to foreign markets. Over the course of several years, state funding has decreased, and the City no longer receives as much aid to improve its public works, including the City's sewers and treatment plant for which the citizens pay the sixth-highest sewer rates in Ohio.

{¶ 3} The City owns and operates a wastewater treatment plant and wastewater collection system that carries wastewater to the City's plant for treatment. Once the wastewater has been treated, the ultimate discharge (also known as effluent) is routed toward and emptied into Paint Creek. The Ohio Environmental Protection Agency (EPA) issued through the United States EPA a National Pollutant Discharge Elimination System (NPDES) Permit to the City, which permits the City to discharge the treated wastewater/effluent into Paint Creek. The NPDES Permit sets forth effluent limitations that the discharges from the treatment plant must meet, as well as testing requirements. The City is required to submit results of the periodic testing of effluent levels to the Ohio EPA for review.

{¶ 4} The City's sewer system is a separate sanitary sewer system in that it is not designed to carry both storm water and sewage to the treatment plant. As a result, the City's current system lacks the necessary capacity to carry flow to the treatment plant when "clean water" (such as rain water or water from Paint Creek) enters the sewage system. When clean water enters the City's sewer system, the sanitary sewer cannot handle the capacity and the water and sewage overflows and floods the streets, streams, and basements of the City's residents.

**{¶ 5}** In 2006, the state filed a complaint for injunctive relief and civil penalties against the City for violations of R.C. Chapter 6111, Ohio's water pollution control law, and rules adopted as part of the statute. The state specifically alleged that the City violated the pertinent statute by failing to properly operate and maintain its wastewater treatment plant. The state's allegations were based upon the city's allowing discharges of raw and partially treated sewage from its sewer system to enter state waterways. The state, through the Ohio EPA, and the City resolved the violations alleged in the complaint by agreeing to a Consent Order, which was accepted and entered by the trial court in January 2007.

**{¶ 6}** The Consent Order addressed the City's need to: (1) immediately comply with R.C. Chapter 6111, the rules adopted pursuant to the statute and terms and conditions of the NPDES Permit, (2) properly manage, operate, and maintain the sewer system by providing adequate capacity, taking all feasible steps to stop sanity sewer overflows and sewage backups into buildings, and provide notification to parties with a reasonable potential exposure to pollutants associated with any overflow event,[1] (3) develop and implement a capacity, management, operation and maintenance program (CMOM) by October 1, 2007, (4) provide a summary of the CMOM program to the Ohio EPA by October 1, 2007, (5) complete an audit of the CMOM program and provide a report to the Ohio EPA by March 8, 2008, (6) submit an Overflow Emergency Response Plan by October 1, 2006,[2] (7) implement the Overflow Emergency Response Plan by December 1, 2006, (8) submit a System Evaluation and Capacity Assurance Plan (SECAP) and SECAP Implementation Schedule by

---

1. According to the Consent Order, a "Sanitary Sewer Overflow" (SSO) is an overflow, spill, or release of wastewater from the City's sanitary sewer system, including inceptor sewers. Some of the overflows discussed during the hearing included untreated and partially treated sewage flowing into local waterways, coming out of manholes onto the roads and streets, and spilling into the basements of homes and buildings in Washington Court House. The overflow material is raw sewage that has not been treated at all because the sewage overflows before it reaches the treatment plant.

2. Several of the completion dates preceded the actual filing of the Consent Order with the court, and such projects were completed by the City before the trial court accepted the Consent Order.

July 1, 2008 to the Ohio EPA for review and approval with the goal of the SECAP being to provide adequate capacity to convey base and peak flows for all parts of the City's sewer system to the watershed treatment plant for full treatment, and (9) achieve the goals of the SECAP by no later than July 1, 2011.

{¶ 7} While the Consent Order was meant to constitute full satisfaction of the City's civil liability for the violations alleged in the state's complaint, the order also provided that the state had the authority to pursue relief should the City continue to violate applicable environmental rule or statutes, and that the trial court would retain jurisdiction over the issue.

{¶ 8} The City submitted the CMOM, CMOM Audit, and Overflow Emergency Response Plan according to the Consent Order. However, the state alleged that the City's submission of the SECAP and SECAP Implementation Schedule did not meet the requirements of the specifics set forth in the Consent Order. One such problem with the SECAP and accompanying schedule was that within the Consent Order, the City agreed to implement the necessary improvements to the City's watershed treatment plant and sewer system by July 1, 2011, but then suggested an end date of 2028 for having the improvements made within the Implementation Schedule. The state also considered several of the projects that the City had included within the SECAP as unnecessary. Given the inconsistencies between the Consent Order and the submitted SECAP and Implementation Schedule, the Ohio EPA did not approve the submissions.

{¶ 9} Within the Consent Order, the parties agreed that should the City fail to meet its obligations, the City would be required to pay stipulated penalties according to a schedule set forth in the Consent Order. These stipulated penalties included penalties for each sanitary sewer overflow, bypass, and violation of the effluent limitations contained in the City's NPDES Permit, as well as penalties for missing deadlines such as missing the

implementation of the SECAP.[3]  While the City paid approximately $58,000 in penalties for most of the sanitary sewer overflows, bypasses, and effluent limitations that occurred following the entry of the Consent Order, the City did not pay all of the stipulated penalties, nor penalties for failure to meet the requisite deadlines.

{¶ 10} The state then filed a motion for contempt, asking the trial court to find the City in contempt for failure to perform according to the Consent Order.  The City responded to the contempt motion, and asserted the defense that it was impossible to perform within the three-year deadline for the SECAP Implementation Schedule as agreed upon in the Consent Order.

{¶ 11} The trial court held a two-day hearing, during which it heard testimony from five witnesses and reviewed evidence on the matter.  The five witnesses were Sheree Gossett-Johnson (an inspector for the Ohio EPA), Joseph Denen, (the City's manager), Joseph Burbage (the City's Service Director), Allen Dawson (the City's Wastewater Superintendent), and Professor Paul Gottlieb from Rutgers University.  The trial court issued a decision finding that contempt was improper because the state failed to carry its burden of proof. Nonetheless, the trial court ordered the City to pay stipulated penalties for violations that occurred in 2012, and to complete five specific sewer improvement projects by January 1, 2030.  The state now appeals the trial court's decision, raising the following assignment of error:

{¶ 12} THE TRIAL COURT ERRED IN FINDING THAT THE STATE FAILED TO MEET ITS BURDEN OF PROOF THAT A FINDING OF CONTEMPT IS WARRANTED FOR ANY OF THE CHARGES FILED.

{¶ 13} In its assignment of error, the state argues that the trial court erred in finding

---

3.  As will be discussed in more detail later in this opinion, "bypass" refers to the process of sending excess sewage flow (comprised of raw or partially-treated sewage) directly into Paint Creek, rather than being fully treated before discharge.

that the City was not in contempt for failing to abide by the Consent Order.

{¶ 14} Contempt of court is defined as "disobedience of an order of a court * * * which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." *Sparks v. Sparks*, 12th Dist. Warren No. CA2010-10-096, 2011-Ohio-5746, ¶ 11, quoting *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55 (1971) paragraph one of the syllabus. To support a contempt finding, the moving party must establish by clear and convincing evidence that a valid court order exists, that the offending party had knowledge of the order, and that the offending party violated such order. *Dudley v. Dudley*, 12th Dist. Butler No. CA2012-04-074, 2013-Ohio-859, ¶ 13.

{¶ 15} A consent order is a contract between the parties based upon the agreements reached by those parties. *Save the Lake v. Hillsboro*, 158 Ohio App.3d 318, 2004-Ohio-4522 (4th Dist.). The Consent Order in the case sub judice became an order of the trial court when the parties submitted the Consent Order to the trial court for its approval, and the trial court approved the Consent Order. The Consent Order provides, "the Court will retain jurisdiction of this action for the purpose of administering or enforcing [the City's] compliance with this Consent Order," so that the trial court retained jurisdiction to enforce the parties' compliance. As such, the failure to comply with the Consent Order is an action for which the trial court could have made a finding of contempt.

{¶ 16} The state alleged three reasons that the trial court erred in failing to find the City in contempt, (1) the City failed to submit a SECAP and Implementation Schedule in accordance with the consent order, (2) the City violated the effluent limits contained in the City's NPDES Permit, and (3) the City failed to pay stipulated penalties for effluent violations.

{¶ 17} Regarding the City's failure to submit a SECAP and Implementation Schedule, the Consent Order provided,

> By no later than July 1, 2008, [the City] shall submit to Ohio EPA
> for review and approval a System Evaluation and Capacity

- 6 -

Assurance Plan ("SECAP") including an implementation schedule. The goal of the SECAP and the SECAP implementation schedule is to provide adequate capacity to convey base flows and peak flows for all parts of [the City's] sewer system to the WWTP for full treatment. An additional goal is to take all feasible steps to stop, and to mitigate the impact of SSO(s) and WIB(s).[4]

* * *

The SECAP implementation schedule shall be submitted to Ohio EPA for approval. The implementation schedule shall include an end date of no later than July 1, 2011 by which [the City] will have achieved the goals set forth in paragraph 13. The implementation schedule, as approved by Ohio EPA, shall be incorporated into this Consent Order and become an enforceable part of the decree. [The City] shall comply with the schedule and perform all of the projects identified in the schedule. [The City] shall provide Ohio EPA with annual reports on the progress of the projects set forth in the implementation schedule.

{¶ 18} The record indicates that the City submitted the SECAP to the Ohio EPA in June 2008. The City's SECAP set forth its plan to meet the goals expressed in the Consent Order. The City also submitted an accompanying SECAP Implementation Schedule that set forth the date for meeting the SECAP goals, and indicated that all goals would be met and projects completed by 2028, rather than the July 1, 2011 date set forth in the Consent Order. While we agree with the state that the City did not abide by the completion date set forth in the Consent Order, we do not find that the City is in contempt for not abiding by that term.

{¶ 19} Stated once more, the goal of the SECAP and the SECAP Implementation Schedule was to provide adequate capacity to convey base flows and peak flows for all parts of the City's sewer system to the water treatment plant for full treatment. An additional goal was to take all feasible steps to stop, and to mitigate the impact of overflows and incidents where water and sewage flowed into the basements of homes and buildings in the

---

4. WIB is an acronym for incidents when water flows into basements of homes and buildings. The Consent Order defines WIB as "wastewater backups into buildings that are caused by blockages or flow conditions in a sanity sewer other than a building lateral."

community. The City's SECAP proposed several projects meant to facilitate the elimination of overflows, bypasses, and effluent that exceeded permit levels. These projects were designed to meet the *goals* set forth in the Consent Order, and the Consent Order mandated that the City create a SECAP that addressed the goals. The Consent Order, did not, however, mandate that *approval* of the SECAP was a necessary predicate to the City's compliance with the Consent Order.

{¶ 20} The Consent Order did not define "goal." The City's manager, Joseph Denen, testified that his understanding of the word "goal" during the negotiation process was "that to which somebody strives, that which you aspire to, that which you seek." Using the word "goal" and requiring the City to create a SECAP to set forth *goals* indicates that there was not a concrete legal basis for requiring the City to take any specific action or set of actions to meet aspirational ends. Even so, the City included several projects that were designed to create a SECAP with specific goals in mind, and the Ohio EPA did not represent that the SECAP was inadequate to reach the stated goals except for the ultimate deadline being past 2011.

{¶ 21} The state presented testimony from Sheree Gossett-Johnson, who is an environmental specialist with the Ohio EPA, Division of Surface Water for the Central District Office, which services Fayette County. Gossett-Jonson's primary duties include inspecting wastewater treatment plants and helping cities reach compliance with permits. Gossett-Johnson also assists cities in determining what, if anything, is wrong with the city's wastewater treatment plant and how to fix any issues.

{¶ 22} Gossett-Johnson testified that she began working with Washington Court House in 1994 and has been the City's inspector since that time. Gossett-Johnson testified that the City has consistently had problems with its sewer system since 1994, and that the system is "basically falling apart." Gossett-Johnson described that the City's system is a

"gravity sewer" and that pipes come together without being sufficiently connected to each other. The City's wastewater treatment plant is unable to accommodate all of the flow coming through the plant. Consequently, the plant workers pump flow onto the top of the ground, and as increase flow occurs, the plant workers are forced to bypass flow into chlorine content tanks and then directly into Paint Creek. Depending on the amount of flow, the plant may discharge raw and partially treated sewage directly into the creek, thus bypassing full treatment of the sewage.

{¶ 23} Gossett-Johnson testified regarding the City's relevant permits and testing/monitoring requirements. Part of the permits and requirements included a limit on the circumstances permitting bypass. The City is also charged with testing the bypass to determine what type of untreated or partially-treated pollutants are discharged into Paint Creek, and reporting each bypass incident to the Ohio EPA.

{¶ 24} Gossett-Johnson testified that she acted on behalf of the Ohio EPA in negotiating the Consent Order, and that the purpose of the order was to ensure that the City was reviewing its wastewater treatment and determine a way to stop sanitary sewage overflows and bypassing full treatments. In order to reach the two specific goals of limiting overflows and bypass incidents, as well as addressing effluent limits listed in the NPDES Permit, the Ohio EPA required the City to submit a SECAP and a CMOM (Capacity Management Operations and Maintenance plan) to address ways that the City planned on reaching the goals.

{¶ 25} Gossett-Johnson testified that the City submitted the required CMOM and later performed an audit of its CMOM. The City also submitted an overflow response plan, but did not submit a SECAP or Implementation Schedule that was approved by the Ohio EPA. Gossett-Johnson testified that the SECAP and Implementation Schedule were due by July 1, 2008, and that the City submitted its SECAP and Implementation Schedule in June 2008,

before the deadline set forth in the Consent Order. Gossett-Johnson testified that she did not approve the SECAP or Implementation Schedule because neither conformed to the timeline set forth in the Consent Order with completion by July 2011. Gossett-Johnson also testified that the City presented plans to build or improve upon city structures that were not necessary to the overall improvement of the sewage system, and that such improvements were costing the City time and resources that should have been dedicated to the improvements that were necessary to reach the SECAP goals.[5]

{¶ 26} Gossett-Johnson testified that, in her belief, the time table suggested by the City made approval of the SECAP and Implementation Schedule impossible, and thus rendered the City in contempt of the Consent Order. However, there was no testimony presented by the state that the SECAP itself was inadequate to effectuate the overflow, bypass, and effluent goals. Nor was there any evidence presented that the Ohio EPA was opposed to the SECAP for reasons other than the fact that the completion date was past 2011. Gossett-Johnson specifically testified that "there's nothing in the study that we disagree with, we disagree with the timeline."

{¶ 27} The plain language of the Consent Order did not require approval of the SECAP by any certain date, or for that matter, any approval at all. The Consent Order only required the City to present for *review and approval* a SECAP that addressed the goals stated above. The record is undisputed that the City abided by this term, by submitting for review and approval its SECAP that addressed the goals listed in the Consent Order. Therefore, the City was not in contempt for failing to submit the SECAP according to the Consent Order.

---

5. We would note that while the state asserted that some of the projects listed in the City's SECAP were not necessary to achieve the goals set forth in the Consent Order, the Consent Order specifically noted that the SECAP should include "but not be limited to" certain evaluations and projects. Therefore the City was not limited to a specific set or number of projects by the Consent Order.

{¶ 28} The state's argument regarding the 2011 timeline is more specific to the required completion date set forth in the Implementation Schedule. The record is undisputed that the City and Ohio EPA negotiated the terms of the Consent Order and agreed that the Implementation Schedule would include an end date of no later than July 1, 2011, by which time the City would have achieved the goals set forth in the Consent Order. However, the record is patently clear that achieving all of the goals, and thus adherence to the deadline set forth within the trial court's adoption of the Consent Order, was impossible.

{¶ 29} Impossibility of performance is a valid affirmative defense to a contempt charge. *Gauthier v. Gauthier*, 12th Dist. Warren No. CA2011-05-048, 2012-Ohio-3046, ¶ 33. Impossibility of performance occurs when an unforeseen event arises that renders a party's performance of an obligation impossible. *Id.* The performance of the obligation must have been rendered impossible without any fault of the party asserting the defense. *Id.* A party who raises the defense of impossibility of performance has the burden of proving it.

{¶ 30} After reviewing the record, we find that the City has met its burden of proving that it was impossible to implement the goals listed in the SECAP and complete the projects listed therein by July 1, 2011. The record is undisputed that both parties acknowledge that the City was not going to be able to complete the projects by July 1, 2011. Despite each party moving forward with the Consent Order, both knew full-well that the July 1, 2011 deadline was unattainable.

{¶ 31} The evidence presented at the hearing demonstrated that 2011 was an impossible completion date, and thus created an inherently unreasonable goal. Specifically, Gossett-Johnson testified that the City could not have completed the required projects before 2011, and that the more reasonable time frame would be 15 years. During her cross-examination, the City asked, "if what you've typically seen for a city this size is 15 years, you'd agree with me that three years is not possible, right?" Gossett-Johnson answered,

"yes." Therefore, the state never asserted that completion by the 2011 deadline was ever a possibility.

{¶ 32} The City presented the testimony of Professor Paul Gottlieb, who is an Associate Professor at Rutgers University and Department Chair of Agricultural Food and Resource Economics. Professor Gottlieb's expert qualifications were stipulated by the state. Professor Gottlieb testified to the financial conditions of the City, including that it has a higher-than-the-state-average concentration of families/individuals who live at or below the poverty level, as well as a higher concentration of elderly residents who are on a fixed income. Professor Gottlieb also testified to the financial struggles the City faces as it continues to lose jobs to foreign markets or other industrial closures. Professor Gottlieb reviewed the City's financial resources, ability to borrow funds, and challenges facing the City and concluded that it was impossible for the City to have funded the projects necessary to complete the SECAP within three years of entering the Consent Order.

{¶ 33} Professor Gottlieb suggested a 30-year time frame for the City to raise the necessary funds and complete the necessary projects. The Professor's suggestion was based upon the data that the projects would cost approximately $28 to $30 million dollars to complete, and that such expenditure would lead to a 63 percent increase in the overall sewer costs to community residents.

{¶ 34} Whether the reasonable timeframe was 15 years or 30, the obvious conclusion for the trial court and this court to make is that a three-year deadline was impossible to perform.[6] The state alleges that the City cannot assert the impossibility defense because the City is at fault for causing its own impossibility. The state specifically contends that the City caused its own impossibility when it agreed to the 2011 deadline after consulting an

---

6. As previously noted, the trial court ordered the City to perform five specific projects by January 1, 2030 so that the trial court gave the City 17 years from the time of the trial court's entry to complete the sewer improvement projects.

- 12 -

environmental impact firm, receiving advice from attorneys, and after participating fully in the negotiation process with the Ohio EPA.

{¶ 35} It is undisputed from the record that the City did negotiate the Consent Order after conferring with several experts in the field, and that the City openly and expressly agreed to the July 1, 2011 completion date for its Implementation Schedule. Even so, the trial court heard testimony that the Ohio EPA did not ascribe to the belief that a three-year deadline was feasible, and that the Ohio EPA advocated for a 15-year timeframe for completion of the projects required to reach the goals of the SECAP. Moreover, the record is clear that the City entered into the Consent Order without full knowledge of the financial repercussions the sewage projects would have on the City.

{¶ 36} The state anticipated that the costs and affordability of the projects could possibly result in a change to the implementation process. According to the Consent Order, "if a project is not recommended, or if an implementation schedule is impacted due solely to the affordability of the project, [the City] shall provide an affordability analysis including impacts on user rates." This provision in the Consent Order demonstrates that the state was aware that affordability issues could impact the implementation of the sewer improvement projects. Once the City performed its study of the financial feasibility of making the improvements, it concluded that the 2011 completion date was impossible, hence its submission of the Implementation Schedule with a 2028 deadline.

{¶ 37} Joseph Denen, the City's manager, testified that he was involved in the negotiation of the Consent Order and that all parties recognized that the 2011 date was "ambitious." Denen further testified that when the City signed the Consent Order, it did not "know what the projects are or exactly how much they are going to cost. So we always discuss that the affordability study and what are the projects you identify would drive the compliance schedule." Denen further testified that the City did not know how many projects

would be recommended by the consultants or where the City would get the necessary funding to complete the recommended projects.

{¶ 38} After the City was given recommendations for projects, as well as the costs associated with such, the City then submitted its SECAP and Implementation Schedule with a deadline of 2028. While the state is not satisfied that the City submitted its SECAP Implementation Schedule with an end date beyond 2011, the record is undisputed that the Ohio EPA did not consider the 2011 deadline feasible, and continues to maintain a belief that the projects necessary to achieve the goals in the SECAP will take 15 years. As such, the City has proven that complying with the 2011 date was an impossibility, and the trial court was correct in not finding the City in contempt on the state's charge that the City failed to abide by the Consent Order regarding its duty to submit a SECAP and Implementation Schedule.

{¶ 39} Regarding the violation of the effluent limits contained in the City's NPDES Permit, the Consent Order permanently enjoined and required the City to immediately comply with its NPDES Permit and any renewals thereafter. The City was required to monitor and report its effluent levels to the Ohio EPA so that the EPA could determine if the City was meeting its limits for the various requirements set forth in the NPDES Permit.

{¶ 40} The state presented a summary of the violations that had occurred since the Consent Order was agreed upon, which was based upon monthly discharge reports. Through the testimony of Gossett-Johnson, the state presented evidence that the City was required to abide by affluent limits, and that the City's limits had been violated multiple times from 2007-2012.

{¶ 41} Gossett-Johnson testified that cities are self-monitoring in that cities monitor their effluent levels and report such levels to the Ohio EPA. Gossett-Johnson took the self-reported data and reviewed each city for how many violations that city may have had over a

course of one to five years. These reports are referred to as discharge monitoring reports, or DMRs, and are reported to the Ohio EPA on a monthly basis. Gossett-Johnson testified that when there is violation, she has the responsibility to contact the city and determine why the violation occurred and what that city plans to do to come into compliance.

{¶ 42} Should a city have a history of violations and fail to come into compliance, Gossett-Johnson creates a referral, by which she gathers supporting paperwork and documentation showing the city's violations and inability to show compliance. The referral is reviewed by the Ohio EPA's Enforcement Division, and then is discussed with the Attorney General's Office to see if further action must be taken. If the city is able to work out a plan of action to bring the standards into compliance, Gossett-Johnson works with the city to ensure that it has the tools necessary to implement the compliance plan, and to determine if the city's plans are adequate to achieve compliance.

{¶ 43} In the case at bar, the summary of violations had been created using data provided by the City, so that the City was well-aware of the fact that violations had occurred. Gossett-Johnson testified to the City's effluent level violations, as well as its incidents of overflow and bypass. Again, the notice of violations of effluent levels, overflow, and bypass are self-reported by the City so that it would have full knowledge of such violations.

{¶ 44} While the trial court found that the state failed to present clear and convincing evidence of the violations, we find that the state has provided supporting evidence and that such evidence is clear and convincing that the City has incurred violations and has not paid the stipulated penalties for such. The Consent Order set forth stipulated penalties for failure to meet deadlines, failure to stop bypass and overflow events from occurring, and for failing to meet daily effluent limits set forth in the NPDES Permit.

{¶ 45} The record contains evidence that the City paid $58,000 in stipulated fines, but did not pay others. Joe Burbage, the City's Service Director, testified that the City did not

receive notice from the state or Ohio EPA stating that the $58,000 was insufficient to satisfy the stipulated penalties. While there is no dispute in the record that the City paid part of the stipulated fees, the record also indicates that the City has not paid all of the stipulated penalties for its violation of the effluent levels, and incidents of overflow and bypass, and that a lack of notice from the state did not excuse the non-payment of stipulated penalties.

{¶ 46} While the City tried to defend its contempt by stating that the Ohio EPA and state failed to provide notice of the penalties, the record is clear that the City knew of its violations based upon the fact that such violations were self-reported and based upon testing and data the City collected and furnished to the Ohio EPA. Therefore, the City knew of its violations and that it had incurred more stipulated penalties. In fact, Burbage testified that the City paid the $58,000 in penalties on its own, and did not receive a phone call or letter indicating that $58,000 in penalties had accrued which required payment. Burbage did not, however, explain why the City would then require notice through a call or letter regarding the unpaid penalties when none had been previously required to prompt the City to pay $58,000 in penalties. During the state's cross-examination of Burbage, the following exchange occurred.

> [Q] And it's my understanding from your testimony that you're stating that these are stipulated penalty payments made under the consent order, is that correct?
>
> [A] Yes ma'am.
>
> [Q] Who told you to make that payment?
>
> [A] Nobody.
>
> [Q] So no one from the Attorney General's office called you and said you owed us money?
>
> [A] No ma'am.
>
> [Q] No one from the Ohio EPA called you and said pay us?
>
> [A] No ma'am never got the first call.

[Q] So you recognized there was a violation and sent in the check[?]

[A] Yes.

This exchange demonstrates that the City was capable of understanding and calculating when it owed stipulated penalties and what such penalties would be.

**{¶ 46}** The City also tried to defend its contempt based on the fact that it did not pay any stipulated penalties in 2012 once the state filed its contempt charges. However, there is nothing in the Consent Order that stays the required payment of stipulated penalties on the filing of contempt charges. Instead, the Consent Order provides, "nothing in this Consent Order shall be construed so as to limit the authority of the State of Ohio to seek relief against [the City] or other appropriate persons for claims or conditions not alleged in the complaint, including violations which occur after the filing of the complaint * * *."

**{¶ 47}** The City knew of its burden to pay the stipulated penalties and did not do so. By signing the Consent Order, the City expressly agreed to pay penalties should it fail to comply with the Consent Order regarding effluent levels and incidents of bypass or overflow. The Consent Order expressly provides that payments for stipulated penalties "shall be made by March 1 of each year for the preceding year's SSO(s) or WWTP bypass(es)," and that payments of stipulated fines "shall be made within forty-five (45) days from the failure to meet the applicable NPDES permit limitation." The Consent Order, does not, however, make payment contingent upon notification to the City of the accrued stipulated penalties or provide that such penalties are not owed should the state file contempt charges for nonpayment of the stipulated penalties. Thus, the City is in contempt for failing to obey the Consent Order, as adopted by the trial court, requiring the City to pay the stipulated penalties.

**{¶ 48}** The record indicates that despite finding that the City was not in contempt, the trial court ordered the City to pay the stipulated penalties "for the calendar year 2012 to the

present for effluent violations and overflow/bypass events." However, prior to the trial court's order, the trial court recognized that "the terms of the Consent Order require the City to pay stipulated penalties for each overflow and/or bypass event from the date of the order. The City has experienced forty seven (47) overflows and thirty eight (38) bypass events from that date to the time of the hearing. All penalties have been paid by the City for 2007, 2008, 2009, 2010." However, the record indicated that the City did not pay fines for 2011 or 2012. Therefore the trial court's order that the City needed to pay the stipulated penalties should have been preceded by a finding of contempt, as the state presented clear and convincing evidence that the stipulated penalties were due and owing, the City was aware of such penalties and their requirement to pay them, and that the City failed to pay the penalties according to the order.

{¶ 49} After reviewing the record, we overrule the state's assignment of error as it pertains to the trial court's finding that the City was not in contempt for failing to submit a SECAP and Implementation Schedule, as the evidence is uncontroverted that completion of the goals set forth in the SECAP by the 2011 deadline was impossible. While cities are not permitted to unilaterally disregard mandates set forth by the Ohio EPA, especially when such terms are agreed upon by the parties, the unique circumstances of this case demonstrate that the 2011 completion date was impossible to achieve so that the City is not in contempt. However, we sustain the state's assignment of error insomuch as the trial court abused its discretion in finding that the state failed to prove that the City was in contempt for not paying the stipulated penalties.

{¶ 50} Upon remand, the trial court shall enter a finding of contempt against the City regarding the unpaid stipulated penalties, and order the City to pay such penalties. Although the trial court ordered the City to pay the penalties accrued in 2012, the trial court shall determine if the City has failed to pay any other stipulated penalties accrued in the years

previous to the state's filing of contempt, including any violations for failure to meet the NPDES Permit effluent limitations, as well as any overflows and bypass events that may have occurred prior to 2012 that have remained unpaid by the City.

{¶ 51} Judgment affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

S. POWELL, P.J., and M. POWELL, J., concur.